Per Curiam :
This case was referred to then Trial Commissioner Herbert N. Maletz (now a Judge in the United States Customs Court) witli directions to make findings of fact and recommendation for conclusions of law under tbe order of reference and Buie 57(a). The commissioner has done so in an opinion and report filed on July 26,1967. Exceptions to the commissioner’s findings and recommended conclusion of law were filed by plaintiff and the case was submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, it hereby adopts the same as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff is not entitled to recover and the petition is dismissed.
opinion op commissioner
Maletz, Commissioner: Plaintiff was employed by the Government for about 14 years. In his last assignment, he *867 was employed as a chemist at the Naval Propellant Plant, Indian Head, Maryland, from March 1960 until March 13, 1964, when he was discharged on the ground of inefficiency. He brought this action claiming that his separation was unlawful, arbitrary and capricious, and resulted from bias, prejudice and malice. The court denied defendant’s motion for summary judgment without prejudice and returned the case to the trial commissioner for trial “on the issue as to whether the dismissal of plaintiff was in good faith, including plaintiff’s claim of bias, prejudice and malice attributed to the defendant resulting in the separation of the plaintiff in a manner contrary to the law and regulations.” Based on the following detailed findings of fact, it is found that plaintiff’s separation was for the efficiency of the service, was made in good faith, and was not motivated by bias, prejudice or malice on the part of the defendant. Accordingly, it is concluded that plaintiff is not entitled to recover and that his petition should be dismissed.
Findings op Fact
1. Plaintiff is a citizen of the United States and resides at 201 Audrey Lane, Oxon Hill, Maryland.
2. Plaintiff attended the College of the City of New York where he received a Bachelor of Science degree in 1941. In 1952, he received a Master of Science degree in chemistry from Stevens Institute of Technology. Since then he has taken various courses in chemistry and physics at Rutgers University, Polytechnic Institute of Brooklyn, and Stevens Institute.
3. In the period from September 1946 through April 1951, plaintiff had his own business in which he manufactured insecticides and engaged in experimental work involving extraction of insecticides.
4. For about 14 years until March 1964, plaintiff was employed by the United States, first as a chemist for about four years at the Raritan Arsenal, Metuchen, New Jersey, where his starting grade was GS-5 and his final grade was GS-7. Beginning in or about 1955 and continuing to March 1960, he was a Supply Cataloguer in the Navy Materiel Catalog Office in the grade of GS-9. His duties in that assignment required *868 examination of various items related to tbe chemical field, and a determination of the item’s classification and of which agency would have priority in controlling it. In March 1960, plaintiff transferred to the Naval Propellant Plant at Indian Head, Maryland, where he was employed as a chemist, GS-9, until he was discharged, effective March 13, 1964, on the ground of inefficiency.
5. At the time of his employment by the propellant plant, plaintiff’s education and experience had been primarily in plastics and physical chemistry. At the propellant plant, plaintiff’s initial assignment was in the Plastics Branch of the Chemical Physics Division, Research and Development Department, where he worked with plastics and gelled propellants during 1960, 1961 and most of 1962. During this period, two of plaintiff’s reports on gelled propellants were printed by the Naval Propellant Plant.
6. (a) On May 1, 1962, plaintiff’s classification was changed from Chemist (General) to Chemist (Physical), GS-9. His duties in the latter classification, as set out in the job description, were “to plan, review, carry out and report on physical chemical studies as relate to the characterization of a particular compound or class of compounds as an ingredient in a propulsion system.” The job description further provided:
Such studies include, but are not limited to, the measurement of vapor pressure by the dynamic air-saturation method, viscosity, refractive index, density, etc. The incumbent has access to apparatus for the measurement of ignitability, heat of combustion and heat of explosion. It is the duty of the incumbent to make use of these and other tests outside the branch which he deems necessary for a complete evaluation of Ms particular studies. Tests which he may be expected to use outside his branch include cavity drop tests for sensitivity to shock, strand burning rate determinations and routine qualitative and quantitative organic and inorganic analysis. The incumbent examines literature on related work and recommends improved apparatus and methods to be used. In many cases he is required to design, modify and adapt existing procedures and apparatus to conform to his particular needs. In all phases of his work the incumbent reviews the experimental data obtained and these are presented periodically as written reports. Any major de *869 viations in method and/or apparatus, proposed by the incumbent, are subject to review by bis supervisor.
He is required to plan and execute the formulation of small laboratory quantities of new propellants to be used in safety tests such as bullet impact, card gap, etc. He is expected to devise new procedures and new equipment when necessary in order to carry out a new formulation. New procedures and new apparatus are subject to review and approval by his supervisor.
(b) The job description contained the following provisions dealing with supervision and guidance:
The incumbent normally receives assignments in writing. When the nature of the assignment is such that new techniques or procedures are required, the incumbent receives detailed instructions and has frequent conferences with his supervisor to insure that the procedures are adequate and are being adhered to. In most cases, however, the supervisor states only the experiments or calculations to be performed, and informs the incumbent of pertinent factors to be observed but states, only in general terms, the apparatus to be used and procedures to be followed. Project plans serve only as a guide in stating the problem and as an outline of the type of information needed. Both the open and the classified literature serve as auxiliary guides in his work and he must maintain a review of such work in order that his investigations be kept up to date.
7. On July 22,1962, plaintiff was formally reassigned from the Plastics Branch to the Thermodynamics Branch (which was also in the Chemical Physics Division of the Research and Development Department). However, the greater portion of his time until November 1962 continued to be devoted to performing residual work of the Plastics Branch and supervising the work of three technicians in this area. In early November 1962, the Plastics Branch was dissolved and its work reassigned to the pilot plaht.
8. (a) In August 1962, following a request from the pilot plant at the installation to ascertain whether nitroform formed an azeotrope with water,[1] plaintiff’s supervisor, Dr. Joseph G. Tuono, head of the Chemical Physics Division and *870 acting bead of the Thermodynamics Branch, requested plaintiff to ascertain whether there was anything the branch could do to help. The problem, as explained to plaintiff by Tuono, was to consult the engineers in the pilot plant, obtain whatever information they had as to the properties of the materials involved, and consult the non-classified literature for the selection of an appropriate apparatus for determining whether nitroform formed an azeotrope with water.
(b) As an extension of the problem, Tuono pointed out to plaintiff that it would be desirable for the Thermodynamics Branch to be in a position to be able to respond to requests for vapor pressure measurements in connection with other problems that the pilot plant might have and that the immediate problem raised by the pilot plant — as to whether or not nitro-form formed an azeotrope with water — would provide plaintiff a good opportunity to get introduced to vapor pressure measurements and become an expert in the field. At this time (August 1962), there was no one in the branch or division who was fully cognizant of vapor pressure measurements and Tuono concluded that someone should become familiar with such measurements.
(c) Tuono further advised plaintiff (i) that as a result of the pilot plant’s manufacturing process, a ternary system was obtained, i.e., a chemical mixture consisting of three compounds — nitric acid, water and nitroform; (ii) that the overall problem was to separate nitroform from the water and the nitric acid; (iii) that the pilot plant was interested in improving the yield by obtaining a higher percentage of nitroform out of each reaction mixture; and (iv) that in order to be able to do this more efficiently plaintiff should try to study the vapor pressure temperature relationships of this ternary system. A study to determine whether a ternary system — as contrasted with a binary system (such as nitroform and water)- — -forms an azeotrope is highly complex and requires at least a doctorate level of proficiency.
9. From August until early November 1962, when the plastics work was reassigned to the pilot plant, plaintiff spent approximately an hour a day on the assignment to determine whether nitroform and water formed an azeotrope; there *871 after be was able to spend full time on it. The assignment was within the capabilities of a GS-9 physical chemist.
10. The assignment was carried out under the following conditions: (1) Tuono, the head of the division, was also acting head of two of the four branches; (2) Tuono was not an expert in azeotropy or vapor pressure measurements; (3) the assignment was oral and Tuono placed no time limit on it though he expected that since it was a pilot plant problem, plaintiff would discuss it with the personnel of that plant and obtain an indication from them as to what time schedule would be necessary if the information to be obtained was to be of any value to them; (4) the extent of the difficulty of the problem was not known to Tuono; and (5) although the elaboration of the study to determine the complete vapor pressure temperature relationships of a ternary system would be outside the competency of a GS-9 physical chemist, Tuono expected that plaintiff would have enough know-how to report back as to what, if any, part of that problem could be done.
11. About a week after receiving the assignment in August 1962, plaintiff showed Tuono a book by Swietoslawsky entitled Ebulliometric Measurements — an authoritative work on azeotropy — and suggested that an appropriate apparatus for the azeotrope determination would be an ebulliometer which was diagrammed in that book.[2] Tuono told him that was fine and asked him to get on with the project. Through the remainder of August 1962 and until mid-November 1962, plaintiff continued to study the Swietoslawsky book and to investigate different types of ebulliometers in order to decide the proper dimensions for the different parts of the apparatus.
12. During November 1962, Tuono talked to plaintiff at least once a week about the pilot plant’s problem of investigating the properties of nitroform and water, and plaintiff indicated that he had an apparatus and was acquiring background information for its assembly and use. In addition, in November 1962, plaintiff submitted a quarterly written re *872 port to Tuono stating that on the basis of a literature search, it seemed feasible to study the problem by means of ebullio-metric measurements and that an ebulliometric apparatus was being designed and would be constructed to investigate the azeotropic relations between nitroform and water. However, other than being shown the diagram in the Swietoslaw-sky book, Tuono never got any results from plaintiff or any indication from him that the project was beyond his competence. An ebulliometer for the project was not made by plaintiff.
1¡3. Plaintiff did not regard the determination of vapor pressure temperature relationships of a ternary system as part of his assignment from Tuono.
14. (a) On November 29,1962, Tuono sent a memorandum to plaintiff advising that since the rating the latter received was 3.3, he had not demonstrated an acceptable level of performance to warrant either a step increase or promotion. Tuono’s memorandum to plaintiff further stated in part:
In August of this year, you were asked to determine the vapor pressure temperature relationships for a ternary system. In evaluating the results to date, it is apparent that too much time was spent in the design and/or selection of a suitable apparatus. This demonstrates a tendency. on your part of striving for perfection in the planning of a project rather than the setting of practical goals which may be reached in a reasonable period of time.
(b) Under the system of ratings which was instituted at the propellant plant at about this time, employees were rated on a scale óf 5, with a rating of 3 considered as average.
15. On December 10, 1962, Dr. Martin F. Zimmer became the head of the Thermodynamics Branch and the supervisor of plaintiff. Several weeks before that, Tuono had told Zim-mer to take over the branch and to look after its program. Zimmer had received, in the summer of 1961, a doctor’s degree in applied chemistry and chemical technology at the Institute of Technology, Munich, Germany, and in connection with his doctorate thesis had worked in 1960 at the Aeronautical Research Institute in Germany where he supervised five professional and sub-professional people. He also had received a Master of Science degree in physical chemistry at the Uni *873 versity of Munich in 1958. A German national, be was employed by tbe Thermodynamics Branch in January 1962 in the grade of GS-12, which was his first employment by the United States Government. Prior to heading up the branch, he had supervised one technician but had no responsibility for supervision of chemists. He had a background in, and experience with, vapor pressure measurements, the determination of azeotropes, and the apparatus used in connection therewith.
16. On December 4,1962, Zimmer first discussed with plaintiff the problem of determining whether or not nitroform and water formed an azeotrope. At that time plaintiff showed Zimmer some four sketches of ebulliometers which he (plaintiff) had prepared in November and which he thought would be useful to study the azeotrope problem. Zimmer was of the opinion, however, that more accurate data could be obtained by using an equilibrium still for the project; he told plaintiff that that type of still should be used for the project and that plaintiff was not to do anything more with ebulliometers.[3]
17. The assignment in these circumstances was for plaintiff to select an equilibrium still from the literature on the subject. A few days later, during the course of another discussion with plaintiff, Zimmer felt that plaintiff did not have all the knowledge he should have regarding the physical properties of nitroform in order to make a proper selection of an equilibrium still and asked him to conduct a literature search of that subject as well. The assignment was shortly afterward expanded to include a literature search of the chemical properties of nitroform.
18. On December 15,1962, the project engineer in the pilot plant canceled the program advising Zimmer that he could not wait for the results. Zimmer, nevertheless, continued plaintiff’s assignment in order to have an apparatus developed in the event a similar program came up again in the future.
19. (a) Zimmer testified that on January 25,1963, during the course of a discussion he had with plaintiff, he reached *874 tbe conclusion that plaintiff could not cope with the problem of designing or selecting an equilibrium still and that he (Zimmer), therefore, told him to stop working on the problem. The record as a whole shows, however, (i) that during the period covered by these assignments (December 4-Jan-uary 25) plaintiff presented to Zimmer three drawings of equilibrium stills taken from textbooks; (ii) that the first such drawing was submitted about December 15, and the second and third about January 7; (iii) that each of the drawings was professionally suitable for solving the problem relating to azeotropes; and (iv) that Zimmer rejected each drawing without explanation. The record as a whole also shows that plaintiff completed the literature searches on the physical and chemical properties of nitroform as requested and submitted to Zimmer a completed two-part report of the results of such searches, with the first part submitted in or about mid-January 1963 and the second about January 25,1963.[4]
(b) During the period covered by the assignment described in finding 17, the propellant plant was closed down from December 22 to January 2.
20. On January 25, 1963, plaintiff was asked by Zimmer to obtain vapor pressure measurements of chloronitroform through the use of a Hoover apparatus, which plaintiff had built in or about November 1962. Plaintiff had had two such apparatus made at that time, each consisting of a meter stick with a U-shaped tube around which a vapor pressure apparatus could be assembled. Plaintiff had constructed these apparatus while working under the supervision of Tuono because he found them “fascinating.” He did not receive Tuono’s approval to make the apparatus and their construction was unrelated to his assignment except to the extent that it was in keeping with Tuono’s policy for developing techniques for vapor pressure measurements.
21. The assignment of January 25, 1963, to take vapor pressure measurements of chloronitroform was plaintiff’s *875 only assignment at the time. No time requirements were specified.
22. Plaintiff had various difficulties in setting up the apparatus in connection with this new assignment of January 25, and he did not start taking measurements until March 12. He then proceeded with the measurements and made about 18 by the end of March, at which time he presented the data in a report to Zimmer. Zimmer then asked plaintiff to make additional vapor pressure measurements of chloronitroform. In accordance with this request, plaintiff made about 12 more measurements which he completed about April 15, setting forth the results in a report to Zimmer on or about May 8. Zimmer then asked plaintiff to obtain further vapor pressure measurements of chloronitroform at several other specified temperatures and pursuant to this, received additional data from plaintiff in June.
23. No more than four and a half weeks should have been necessary to complete the chloronitroform assignment, with three weeks reasonably needed to prepare the apparatus and an additional seven days reasonably needed to obtain the 30 measurements — which were routine in nature. On this basis, plaintiff reasonably should have completed the assignment by the end of February.
24. The eleven-week period required by plaintiff to complete the chloronitroform assignment (i.e., from January 25 to April 15) was excessive.
25. During this period, Zimmer frequently asked plaintiff why the assignment was taking so long. In reply, plaintiff usually would mention a particular problem relating to the setting up of the apparatus.
26. On March 14, Zimmer sent plaintiff a memorandum— which was included as an enclosure to a later letter of charges — stating that the work the latter had accomplished in the last 16 weeks had been unsatisfactory. The memorandum asserted in part that plaintiff was “not able, within the past 10 weeks, to get reliable results on v.p. [vapor pressure] of NF [nitroform] and d NF [chloronitroform], but these measurements can be done within a couple of weeks — all corrections included.” This statement was inaccurate in several respects. For one thing, at no time prior to March 14 had *876 plaintiff been given an assignment by Zimmer to obtain vapor pressure measurements of nitroform; bis assignment ratber was limited to making vapor pressure measurements of chlo-ronitroform. See finding 20. Second, tbe cbloronitroform assignment was given plaintiff on January 26 — wbicb was about seven weeks from March 14 — tbe date of Zimmer’s memorandum — ratber than 10 weeks as indicated in tbe memorandum.
27. On or about March 14, 1963, Zimmer bad a meeting with plaintiff in wbicb be was extremely critical of plaintiff’s work. He indicated that plaintiff didn’t belong in his section; that be was not a competent chemist; and that be should transfer to some other branch.
28. Tbe next assignment given to plaintiff by Zimmer was in tbe early part of May 1963; it was to make vapor pressure measurements on nitroform wbicb was being considered as a possible ingredient for use in liquid fuels. At tbe suggestion of. Zimmer a teniscope was originally used; however, tbe apparatus would not work because tbe vapor of tbe nitroform reacted with mercury. Accordingly, on or about May 8, plaintiff was asked by Zimmer to design and have built a high-vacuum vapor pressure apparatus using a Bourdon gauge to make tbe necessary measurements. Plaintiff selected parts and made a design for such an apparatus, including therein several suggestions by Zimmer, wbicb design was quite adequate from a professional point of view.
29. Only a few days’ delay was encountered in obtaining tbe necessary equipment and having various parts prepared by a glassblower. Thereafter, plaintiff experienced various difficulties in setting up the apparatus and making it work. These included difficulties with: tbe elimination of vibrations from tbe oil diffusion pump to tbe vacuum line; tbe light source; and tbe transfer of tbe rack to another bench, an operation wbicb took more than three days although a reasonable time for such transfer should not have required more than a few hours. By July 28, tbe apparatus had not yet been put in working order, at which time Zimmer canceled tbe assignment owing to the fact that tbe other groups working on compatible studies bad by then lost their interest in nitro-form. At tbe time of cancellation, tbe system bad been com *877 pletely set up by plaintiff and the only part that was not operating was the light source.
30. The setting up of this kind of a system and putting it in operating condition are within the competence of a GrS-9 chemist, and a reasonable time for completing the job, including the time needed for glassblowing, should not have required more than two or three weeks.
31. The period of approximaJtely 11 weeks expended by plaintiff in setting up the system and putting it into operating condition to obtain vapor pressure measurements of nitroform was excessive.
32. The last assignment considered in connection with the charges against plaintiff was to obtain the vapor pressure on two polymer compounds, and it was given to him by Zimmer on July 28, 1963. These two materials referred to as EEL and PBAN were used in the pilot plant and the plant was concerned with whether any vapor from the remaining solvents in the polymers would be a hazard to the people working there. The question was thus to determine the vapor pressure of the material. To ascertain this, plaintiff was asked to introduce an isoteniscope into the vapor pressure apparatus already set up and to take two measurements of each of the two compounds (or a total of four measurements), with one measurement to be at room temperature and the other at 60 degrees centigrade. While the vapor pressure measurements thus obtained could not be reliable or meaningful within the limits of scientific accuracy because of the heterogeneous substances involved (i.e., polymeric materials, solvents and entrapped gases), it was possible and plaintiff was expected to get measurements that would be reproducible for practical purposes. This is to say that with the type of apparatus that was available, a measurement could be obtained within an accuracy of a few millimeters as contrasted with a scientific accuracy of a tenth or a hundredth of a millimeter.
33. As set out previously, plaintiff was given this assignment on July 28,1963, and submitted his last report thereon on August 29 — 'about a month later. About six days would have been adequate time to perform this set of measurements. Indeed, during the period involved Zimmer took two of the *878 four measurements, on the same equipment used by plaintiff, within four hours and obtained reliable results. The time taken by plaintiff to carry out this assignment — which was service work charged to the pilot plant — was excessive.
34. All the foregoing assignments, save for the one to determine the vapor pressure temperature relationships of a ternary system, were within the scope of the duties prescribed iii plaintiff’s job description and could be performed by a graduate ehemist who had a minor in, and strong bent towards, physical chemistry.
35. All the foregoing assignments were given to plaintiff orally. With one exception, plaintiff offered no evidence that he misunderstood or was uncertain of his assignments by reason of the fact that they were oral. The exception related to the determination of the vapor pressure temperature relationships of a ternary system — which plaintiff testified he did not consider as part of his assignment from Tuono. See finding 13.
36. The assignments starting with the azeotrope problem given plaintiff by Tuono became progressively less difficult, and no assignment was given him on the assumption that he could not perform it or could perform it only with difficulty.
37. Plaintiff’s alleged inefficiencies were specifically brought to his attention by official memoranda and by conferences from November 1962 through September 1963.
38. On various occasions from July 1963 through September 1963, plaintiff was asked by his supervisors to resign. Thus, in mid-July, Tuono told plaintiff that there had been two quarterly evaluations by Zimmer by this time; that plaintiff’s performance was below average and was not improving; and that he should start looking for another job in his own interest and in the interest of the plant. Plaintiff took no steps to look for another job. About a month later, Tuono had another discussion with plaintiff and told him the plant needed some indication that he would be leaving because his association wasn’t helping the plant in any way. He suggested that plaintiff should submit a resignation effective in six months; that this would give him time to find another position; and that in the absence of a resignation, action would be taken to remove him. Plaintiff refused to submit a *879 resignation, advising Tuono that he wanted to be associated with the propellant industry and that he liked working at the plant. In the latter part of August, Dr. Bartocha, the associate director of the plant for research and development, demanded that plaintiff sign a letter of resignation effective in 60 days. He told plaintiff that his work had been inefficient all along, and that if he didn’t sign the resignation, he would be in for an awful lot of trouble. Plaintiff replied that he would look for another job but would not sign any letter of resignation. About a week later (in early September 1963), Bartocha again insisted that plaintiff sign a letter of resignation to be effective in 60 days. Plaintiff again refused, stating that he had a chance to get another job but this would take two or three months and that if Bartocha was so anxious to get rid of him, all he had to do was wait that short period of time. (At about this time plaintiff, through conferences with the Treasury Department, had received information which indicated that that department would have a vacancy for which he was qualified.) Bartocha replied that if plaintiff didn’t sign the letter of resignation, charges would be filed to remove him for inefficiency and that he didn’t have a chance. A week after that meeting, Bartocha saw plaintiff around noon and told plaintiff he had until 3:00 o’clock that afternoon to sign a letter of resignation, which plaintiff refused to do.
39. On October 11, 1963, the commanding officer of the plant sent plaintiff a notice of proposed action to effect his removal for inefficiency of performance. The grounds for the proposed action were set out in the notice as follows:
2. On 29 November 1962, you were given a notice of a marginal performance to date (for Calendar Year 1962). By oral discussion and written notice (enclosures 1 and 2) you were informed of the reasons for this evaluation. One specific item cited at that time was your failure to determine the vapor pressure temperature relationships of a ternary system. This project was assigned to you in August. This demonstrated your difficulty in planning and conducting your work properly to achieve practical goals in a reasonable period of time. The first duty of your position is to “Plan, review, carry out and report on physical chemical studies as relate to the characterization of a particular compound *880 or class of compounds as an ingredient in a propulsion system.” You were informed of insufficient motivation and drive and of a marginal demonstration of theoretical technical performance. You were also informed that Dr. M. Zimmer, Acting Head of the Thermodynamics Branch, would help you to improve your performance. On 17 December 1962 you were denied a step increase based upon the aforementioned evaluation (enclosure 3). You were advised that your work would be reviewed within twelve months and your step _ increase reconsidered. On 30 January 1963 you received a marginal performance evaluation for the month of December 1962 (enclosure 4). On 1 February 1963 your overall performance for Calendar Year 1962 was rated as satisfactory. On 14 March 1963 you were informed by Dr. Zimmer that your performance for the First Quarter 1963 was unsatisfactory (enclosures 5 and 6). Specific instances cited were: (a) your inability to design or select a suitable ebulliometer for azeotropes in a week; (b) the excessive time taken to complete a literature survey on NF and an equilibrium still; (c) the reporting of uncorrected vapor pressure data for water in the calibration of a vapor pressure apparatus; (d) improper calibration of thermometers; (e) inability to properly assemble a simple vapor pressure apparatus; (f) inadequate knowledge of the purification of organic liquids; and (g) a general inability to meet reasonable schedules. In these tasks you could not fulfill the duties of your position description which states “The incumbent examines the literature on related work and recommends improved apparatus and methods to be used. In many cases he is required to design, modify and adapt existing procedures and apparatus to conform to particular needs. In all phases of the work the incumbent reviews the experimental data obtained and these are presented periodically as written reports.” You are further required to “make decisions regarding the validity of the measurements and calculations, the reliability of the instruments and the data used and at what point the experiments are stopped for recalibrations to be made.” The incumbent must keep “complete and accurate records of experiments and calculations and report experimental results to the precision affected by the experimental limits of the methods and apparatus used.” “He acts on his own initiative in all matters relating to procedures and methods.” You were given an opportunity to discuss Dr. Zimmer’s evaluation in an oral discussion with Dr. J. G. Tuono, Head of the Chemical Physics Division, *881 and Dr. Zimmer. Following this discussion it was determined that your evaluation was proper and justified.
3. Your performance has not improved as evidenced by the following:
a. On 14 May 1963, Dr. Zimmer confirmed his oral discussion of 8 May 1963 informing you that your performance for April was unsatisfactory (enclosure 7). Specific instances cited were a series of vapor pressure measurements completed two weeks behind schedule. You failed to complete vapor pressure measurements on chloronitroform at 25 and 40° C. You were again informed of the excessive time you require to achieve results.
b. Your informal quarterly evaluation for the Second Quarter 1963 was unsatisfactory (enclosures 8 and 11).
c. On 26 July, two samples (PBAN and EEL 2795) were given to you for vapor pressure measurements at two different temperatures. As of 21 August no results had been reported. This was your only assignment during this period of time. On 21 August you were requested to complete these measurements by 23 August. This was confirmed by memorandum dated 22 August (enclosure 9). Your memorandum of 19 August indicates an inadequate understanding of the principles of the ap-
Earatus you were using (enclosure 10). This was after >r. Zimmer explained the correct operation of the apparatus to you. The measurement of vapor pressure is a relatively simple one and should be a routine measurement for a GS-9 chemist.
d.In Dr. Zimmer’s memorandum of 3 September (enclosure 11), he pointed out your inability to cope with minor technical difficulties, such as adjustment of a galvanometer and the isolation of an oil diffusion pump from the vibrations due to the mechanical fore pump. He cited your inability to set up properly a Bourdon gauge in. ten weeks, after a complete discussion of the basic design and operation of this device.
e.In an oral discussion on 26 July you were again denied a step increase on a second consideration. The reasons are cited in the Division Head’s memorandum of 3 September (enclosure 12). Many of the specific instances nave been cited under (d) above. You were informed of your right to appeal this decision to the Department Head.
f.On 4 September you were informed in writing that your results reported on 23, 26 and 29 August show discrepancies of more than 100% for the same sample under the same conditions. These are well outside the limits *882 of experimental error of your equipment. These deviations indicate faulty techniques and a lack of theoretical understanding of the measurements. This memorandum cites the fact that it took from 26 July to 29 August to make four vapor pressure measurements (enclosures 13 and 14). These measurements, when performed by an efficient GrS-9 chemist, should be completed in less than five working days.
4. Your work assignments and your performance were thoroughly discussed with you by Dr. Zimmer on 14 March, 15 April, 8 May, 14 May, 16 July, 22 August, 3 September, and 4 September. You have been give ample time to improve your performance to an efficient level but have failed to do so.
5. Based on the evidence presented, it is determined that your removal is necessary to promote the efficiency of the service. The possibilities of reassignment or change to a lower grade have been considered, but it is found that there is no position in which your services could reasonably be expected to be satisfactory.
40. Following an agency hearing, the commanding officer of the propellant plant wrote plaintiff on March 1,1964, that it had been determined that the proposed removal action was justified and necessary to promote the efficiency of the service, and that plaintiff would be removed from the rolls on March 13, 1964. The removal notice stated, among other things:
3. Testimony and evidence presented substantiated the following charges:
a. You were unable to select or design a suitable equilibrium still for the study of azeotropes in one week as required. Although you were given fairly specific guidelines on the type of apparatus needed, you worked on this assignment from 4 December to 25 January without being able to select and recommend a suitable equilibrium still. Although you stated you submitted a number of drawings to Dr. Zimmer, you did not evaluate the material to select and recommend one suitable still as required.
b. You spent an excessive amount of time coordinating a literature survey on NF and an equilibrium still. Although you were granted a one-week extension, you failed to satisfactorily complete the assignment.
c. You failed to obtain vapor pressure measurements on chloronitroform. After three weeks, from 28 January to 25 February, no results were reported. Although you *883 did submit your results on 3 May, the report was still incomplete.
d. You failed to assemble properly a simple vapor pressure apparatus in order to obtain measurements on chloronitroform. Because of the excessive time you were spending on this assignment, it was necessary for Dr. Zimmer to insulate the apparatus himself and to assist you in chilling the apparatus and in selecting a suitable heater.
e. You failed to obtain reliable vapor pressure measurements on samples of PBAN and ERL 2795 within a reasonable time. Although both Dr. Zimmer and Dr. Tuono stated this assignment should have taken you no more than one week, you worked on this from 26 July to 29 August. The results you finally submitted showed discrepancies of more than 100%. Dr. Zimmer stated he had made two of the four measurements himself in just four hours. He also stated that consistent measurements of the same material had been obtained with similar apparatus both before and after your unsuccessful efforts.
f. You failed to set up properly a vacuum system for vapor pressure measurements using a Bourdon gauge. Although Dr. Zimmer felt you should have been able to complete the assignment in two or three weeks, you had not succeeded after approximately ten weeks. A GS-7 employee subsequently solved one of your problems in a single afternoon.
g. You have not demonstrated an ability to meet reasonable schedules. All of the above items show that you are unable to complete your assignments within the time limits prescribed.
41. On appeal from this adverse decision, the Regional Office of the Civil Service Commission, following a de novo hearing, found that the grounds for the agency decision were factually established and of a nature to justify the adverse personnel action that was taken. This determination was sustained by the Civil Service Commission’s Board of Appeals and Review which concluded that plaintiff had demonstrated a deficient level of ability by requiring excessive time in the performance of properly assigned research tasks and failing to meet reasonable requirements for effective accomplishment of his work assignments.
42. Plaintiff filed a petition in this court on March 30,1965, contending that his separation was unlawful, arbitrary and capricious, and resulted from bias, prejudice and malice.
*884 43. On October 21,1965, defendant filed a motion for summary judgment to dismiss the petition. By order dated April 1, 1966, the court denied the motion without prejudice and returned the case to the trial commissioner for trial “on the issue as to whether the dismissal of plaintiff was in good faith, including plaintiff’s claim of bias, prejudice and malice attributed to the defendant resulting in the separation of the plaintiff in a manner contrary to the law and regulations.”
44. Trial sessions were held on December 12,13,14 and 15, 1966.
45. The record shows that plaintiff’s separation was for the efficiency of the service, was made in good faith, and was not motivated by bias, prejudice or malice on the part of defendant.
CoNCLtrsiON op Law
On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and his petition is dismissed.

 Nitroform is a colloquial name for trinitromethane — a colorless crystal which explodes when heated. An azeotropic mixture is one in which the composition of the vapor and the liquid at the liquid’s boiling point is constant. See Hackh’s Chemical Dietionary (1929).

 An ebulliometer Is an apparatus for making accurate measurements of the boiling points of liquids.

 An equilibrium still is an apparatus for determining tbe composition of vapors obtained from various mixtures of liquids. See note 2, supra, for definition of an ebulliometer. More precise measurements can be obtained from an equilibrium still than an ebulliometer and is thus preferable for determining whether an azeotropic reaction occurs.

 Zimmer’s testimony on this point is conflicting. At the trial he testified that plaintiff never did submit to him the complete results of the literature survey. See tr. 462. On the other hand, he testified at the Civil Service Commission hearing that plaintiff had submitted to him a completed report on the physical and chemical properties of nitroform. See CSC tr. 93-97.